# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

# CHARLESTON DIVISION

DONNA TACZA, et al.,

        Plaintiffs,

v.                                             CIVIL ACTION NO. 2:18-cv-01330

ALECIA MARTIN, et al.,

        Defendants.

## MEMORANDUM OPINION AND ORDER

Plaintiff Donna Tacza ("Plaintiff") brings this action against Defendants Alecia Martin ("Martin"), Bill J. Crouch ("Crouch"), and the West Virginia Department of Health and Human Resources ("WVDHHR") (collectively, "Defendants") under various federal and West Virginia statutes. (ECF No. 5.) She alleges that Defendants improperly placed her biological grandchild with a foster family instead of with her. (*Id.*) Because this action amounts to an appeal of the state court's placement order, it is barred pursuant to the *Rooker–Feldman* doctrine. *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). Accordingly, the action is **DISMISSED** for lack of subject matter jurisdiction.

### I.    BACKGROUND

Plaintiff alleges that on January 5, 2015, a child that was later determined to be Plaintiff's biological granddaughter was born. (ECF No. 5 at 2.) Martin, a CPS caseworker employed by WVDHHR in Calhoun County, West Virginia, initiated abuse and neglect proceedings related to

1

the child, D.K.S., and took "emergency custody" of her. (*Id.*) Two days after her birth, D.K.S. was placed with foster parents and has remained in their home since that time. (*Id.*)

On January 12, 2015, Plaintiff began efforts to obtain custody of D.K.S., which she pursued for several months. (*Id.* at 2–4.) Plaintiff alleges that by April 2015, WVDHHR decided that it would not grant visitation to Plaintiff because it "had no intention of ever placing D.K.S. with [Plaintiff]." (*Id.* at 3.) However, according to Plaintiff, WVDHHR never communicated this to her. (*Id.*) As a result, she continued her efforts to obtain custody of D.K.S. (*See id.* at 4.)

In the meantime, on November 19, 2015, D.K.S.'s parents had a second child, A.L.,[1] who was the subject of an abuse and neglect proceeding in Pennsylvania. (*Id.*) A.L. was placed in Plaintiff's home on January 29, 2016, and Plaintiff later adopted A.L. (*Id.* at 4, 5.)

On February 22, 2016, a West Virginia court terminated the parental rights of D.K.S.'s parents and granted Plaintiff's motion to intervene in the abuse and neglect proceeding. (*Id.* at 4.) The court ordered WVDHHR to complete a home study, which had not been completed as of an April 18, 2016 hearing. (*Id.* at 4–5.) Plaintiff was granted supervised visitation of D.K.S. beginning in May 2016. (*Id.* at 5.) The home study, which was "filed with the Circuit Court of Calhoun County on June 9, 2016," recommended that Plaintiff "be approved as a kinship resource parent for placement of D.K.S." (*Id.* at 5.)

Nonetheless, at hearings conducted on August 25 and 30, 2016, WVDHHR submitted evidence "improperly suggestive that the natural father of D.K.S. presented some present and clear danger of harm to D.K.S." (*Id.* at 6.) Plaintiff suggests that she did not have prior notice of this evidence and was therefore "[un]able to confront [it] prior to the hearing." (*Id.*) The nature of the evidence is unclear from the complaint, but the evidence may be "one suggestive photograph

---

[1] Plaintiff also purports to bring this action on behalf of A.L., as the "natural sister" of D.K.S. (*See* ECF No. 5 at 1.)

of the natural father holding A.L." (*Id.* at 7.) An order "based upon" this evidence was entered on October 7, 2016. (*Id.*) Although it is unclear from the complaint, this Court infers from Plaintiff's other allegations that the order placed D.K.S. with her foster parents, instead of with Plaintiff. Plaintiff argues that Defendants intended this outcome from the beginning and "engage[d] in ... delay tactics ... and presentation of ... misleading and speculative ... evidence" to ensure it. (*Id.*)

## II. LEGAL STANDARD

This Court "may independently consider an issue not raised by the parties when necessary to protect important institutional interests." *United States v. Oliver*, 878 F.3d 120, 124 (4th Cir. 2017). To that end, "courts must always assure themselves of subject matter jurisdiction before reaching the merits, even if the parties have not raised it." *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 187 (4th Cir. 2019) (citing *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)).

The *Rooker–Feldman* doctrine "is a jurisdictional doctrine that may be raised by the court *sua sponte*." *Friedman's, Inc. v. Dunlap*, 290 F.3d 191, 195 (4th Cir. 2002) (citing *Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 197 n.5 (4th Cir. 1997)). Because it is jurisdictional, this Court must address its application "before proceeding further in [the] analysis." *Id.* at 196; *see Jordan*, 921 F.3d at 187 ("Courts must generally decide jurisdictional issues first.").

## III. ANALYSIS

The *Rooker–Feldman* doctrine is a jurisdictional bar to suit when "a party losing in state court ... seek[s] what in substance would be appellate review of the state judgment in a United States district court." *Am. Reliable Ins. Co. v. Stillwell*, 336 F.3d 311, 316 (4th Cir. 2003) (internal quotation marks omitted); *see Lance v. Dennis*, 546 U.S. 459, 463 (2006) (per curiam) ("[U]nder ... the *Rooker–Feldman* doctrine, lower federal courts are precluded from exercising appellate

3

jurisdiction over final state-court judgments."). It "applies . . . when the loser in state court files suit in federal district court seeking redress for an injury allegedly caused by the state court's decision." *Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 713 (4th Cir. 2006); *see Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291–92 (2005) ("In [*Rooker* and *Feldman*], the losing party in state court filed suit in federal court after the state proceedings ended, complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment.").

Plaintiff brings this action against the state agency that was an opposing party in the state court proceedings and its employees, alleging that they violated various statutory procedures that ultimately resulted in Plaintiff not being awarded custody of D.K.S. (*See* ECF No. 5 at 8–12.) For example, Count III alleges that Defendants violated the duty set out in West Virginia Code § 49-4-111(e)(3), which provides that separation of siblings "may be ordered only if the court determines that clear and convincing evidence supports [WVDHHR's] determination" to that effect. (ECF No. 5 at 8–10.) However, as the statute suggests and the complaint alleges, the state court—not Defendants—ultimately "found that it was appropriate to separate siblings." (*Id.* at 7.) Plaintiff's alleged injury thus derives not from the actions of Defendants but from the state court's order permitting D.K.S. to be placed separately from A.L.

Similarly, Counts I and V allege that Defendants violated the duties set out in West Virginia Code § 49-4-114(a)(3) and 42 U.S.C. § 671(a)(19), respectively, to give preference to a child's grandparents when determining the placement of the child. (ECF No. 5 at 8, 11–12.) Again, however, the complaint alleges that the state court entered the order ultimately placing D.K.S. with the foster family instead of with Plaintiff. (*See id.* at 7; *see also* ECF No. 13 at 2.) The fact that the state court entered the order based on evidence submitted by Defendants, (ECF No. 5 at 7), is

4

of no consequence because the ultimate injury Plaintiff alleges—that her granddaughter was placed with a foster family instead of with her—is the result of the state court's order. Notably, if Defendants had violated these statutes but the court nonetheless placed D.K.S. with Plaintiff, Plaintiff would have no injury. Thus, the alleged harm does not stem from Defendants' actions. When there is no "cognizable legal injury until the state court enter[s] its judgment, it follows that . . . the state court judgment was the source of [the plaintiff's] harm." *Smalley v. Shapiro & Burson, LLP*, 526 F. App'x 231, 237 (4th Cir. 2013) (per curiam).

The requested relief further demonstrates that Plaintiff brings this action to "undo" the state court judgment placing D.K.S. with the foster family. In addition to damages, Plaintiff requests "visitation between [Plaintiff] and D.K.S. in the hopes of establishing some long-term loving relationship." (ECF No. 5 at 12.) As an initial matter, "federal courts . . . generally abstain from hearing child custody matters" and have no authority to award custody. *Cantor v. Cohen*, 442 F.3d 196, 202 (4th Cir. 2006). But even if this principle did not exist, in order to grant visitation as relief, this Court must overturn the state court's placement order. "[I]f in order to grant the federal plaintiff the relief sought, the federal court must determine that the [state] court judgment was erroneously entered or must take action that would render the judgment ineffectual, *Rooker–Feldman* is implicated." *Jordahl*, 122 F.3d at 202 (internal quotation marks omitted). This is underscored by Plaintiff's representation that "sufficient grounds exist to collaterally attack [the state court's] finding of imminent danger to D.K.S. if placed with her grandmother." (ECF No. 13 at 2.)

Put simply, Defendants correctly assert that "[t]his matter is an attempt by Plaintiff[] to relitigate the placement of D.K.S." (ECF No. 12 at 1.) It is barred by the *Rooker–Feldman*

doctrine because it "seek[s] redress from an injury that the state-court order itself caused." *Davani*, 434 F.3d at 718.

## IV. CONCLUSION

For the foregoing reasons, this action is **DISMISSED** for lack of subject matter jurisdiction.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: August 19, 2019

_____
THOMAS E. JOHNSTON, CHIEF JUDGE